**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DEBBIE SALAZAR,

        Plaintiff,

v.                                   No. CIV 03-176 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

       Plaintiff Debbie Salazar ("Salazar") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner").   The Commissioner determined that Salazar was not eligible for disability insurance benefits ("DIB") or Supplemental Security Income ("SSI"). Salazar moves this Court for an order reversing for payment of benefits or remanding for a rehearing.  [Doc. No. 7.]

       Salazar was born on September 26, 1961 and was 40 years old when the administrative hearing was held.  She attained a tenth grade education but never achieved her G.E.D., despite several attempts to obtain it.  She has past relevant work experience in a restaurant bussing tables.[1] She also worked in custodial services and as a housekeeper.  She is divorced and lives alone.  She has a grown son who has developmental problems, perhaps as a result of Fetal Alcohol Syndrome.

---

[1]Administrative Law Judge Gerald Cole found it difficult to pin down which of Salazar's jobs might be considered substantial gainful activity, due to many inconsistencies in Salazar's reports of her work history.  [Tr. at 18.]

On March 27, 2000, Salazar applied for DIB and SSI benefits due to major depression.  She alleged an onset date of December 1, 1992.  [Tr. at 63, 71, 231.]  On June 27, 2002, Administrative Law Judge ("ALJ") Gerald R. Cole, held an administrative hearing, during which Salazar was represented by counsel.  On October 2, 2002, Judge Cole issued an unfavorable decision, denying Salazar's requests for benefits.  [Tr. at 9, 12-21.]  The ALJ determined that Salazar could not return to her past relevant work but that there were a significant number of jobs in the national economy that she could perform.  In so finding, Judge Cole relied on the testimony of a vocational expert ("VE") and on the framework of the grid rules.  [Tr. at 20-21.]  Thus, the ALJ concluded that Salazar was not disabled within the meaning of the Social Security Act and Regulations.  [Tr. at 13.]

On January 9, 2003, the Appeals Council denied Salazar's request for review.  [Tr. at 4.]  This appeal followed.  [Doc. No. 7.]

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant nonexertional impairment; (2) that the claimant can do the full range of work at a particular residual

---

[5] 20 C.F.R. § 404.1520(c) (1999).

[6] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[7] 20 C.F.R. § 404.1520(e) (1999).

[8] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[9] 20 C.F.R. § 404.1520(f) (1999).

[10] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  Nonexertional limitations can include mental impairments.  The grids do not consider nonexertional limitations; therefore, if significant nonexertional limitations are present, the grids may not be applicable.  Id.  However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.)  In this case, Judge Cole used both the grids and testimony by a VE in reaching his decision at step five of the analysis that Salazar was not entitled to benefits.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting

his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).   If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.   The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.   Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In an extremely well-reasoned and comprehensive decision, Judge Cole made the following findings:  (1) despite widely varying reports by Salazar concerning her exact work history, Judge Cole gave Salazar the benefit of the doubt that she had not engaged in post-onset substantial gainful activity since about four years earlier (1998) when she allegedly was terminated from her position at Camel Rock Casino; moreover, Judge Cole decided that it was simply unnecessary in this case to determine whether any of her reported work activity was substantial gainful activity [tr. at 14, 20]; (2) Salazar's physical impairments (i.e., complaints of osteoarthritis, musculoskeletal problems, popping in her knees) were not severe physical impairments; (3) Salazar's mental impairments (chronic major depression, generalized anxiety disorder, personality disorder, problems sleeping) were severe but did not meet or medically equal one of the listed impairments; (4) Salazar's allegations regarding her limitations and symptoms of pain were not totally credible; (5) she had the RFC for work at all levels of exertion based on her lack of physical limitations, but her mental limitations affected her ability to perform basic mental work activities; thus, Salazar could perform only simple, repetitive tasks in jobs that did not entail extensive interaction with the public, co-workers or supervisors; (7) based on these findings, it was unclear whether Salazar could return to her past relevant work, and Judge Cole again gave her the benefit of the doubt concluding that she was unable

to return to any her past relevant work; (8) at step five, Judge Cole considered Salazar's age, level of education, work history and testimony by the VE; he also utilized the grids but only as a framework since nonexertional limitations were present; and (9) the ALJ ultimately concluded that Salazar's limitations did not substantially reduce the number of sedentary, light, and medium jobs she could perform.  [Tr. at 13-19.]

## Summary of Salazar's Work History and Medical Records

### *1997-1999 Medical Records*

Salazar's earliest medical records begin in 1997.  She was seen at the St. Vincent Hospital Emergency Room for several different problems un-related to her application for benefits.  One record does, however, indicate that she was taking Paxil, an anti-depressant.  [Tr. at 109, 110.]

In July 1998, she had her first office visit with Dr. Leiby, a psychiatrist. [Tr. at 176.]  She was referred to him for depression, and reported that her first incident with depression occurred about four years earlier.  She also stated that she had been seen at St. Vincent's then and had been suicidal. However, there are no records earlier than 1997.  Dr. Leiby noted that she was tolerating Paxil well, although she was unable to take as much as 40 mg of that medication because of side effects of sweating.  On July 14, she reported feeling slightly depressed.  She had suicidal ideation but no plan to hurt herself.  She had been married for 17 ½ years since the age of 17.  Salazar had held many jobs but claimed that Camel Rock Casino fired her in November 1997 due to her depression.  Again, there are no medical records specifically referring to her depression in 1997 or employment records to substantiate that she was terminated.  Dr. Leiby diagnosed her with major depression – partially treated, and a personality disorder.  He assigned a GAF of 40.  [Tr. at 176.]

She saw Dr. Leiby four more times in 1998. The office records indicate that she was doing well on Paxil, her mood was stable, her energy was good at one point, and she was able to work without difficulty. [Tr. at 173-75.] She reported an altercation with her boyfriend in September 1998 and stated that he was harassing her. She felt very depressed, was crying, had feelings of worthlessness and suicidal ideation. In October she was off work for a week but returned to work and was feeling better. [Tr. at 172.]

In 1999, she saw Dr. Leiby about seven times. She also visited a medical center and/or hospital for various complaints, including ear pain, gynecological problems, and a fall from a ladder. [Tr. at 112, 142-43.]

Dr. Leiby's 1999 office records indicate that when Salazar was taking the Paxil, she did pretty well. However, when she missed doses or tried to cut back on the medication, she immediately felt depressed and irritable. [Tr. at 166-68, 171.] In May 1999, she was trying to work as a house cleaner. She was in a motor vehicle accident and suffered whiplash to her neck and shoulders. However, there are no hospital records to substantiate that she was treated for whiplash. [Tr. at 170.] Dr. Leiby's June 1 record indicates that Salazar was put on probation for six months, and on August 10, it was noted that she continued to have legal problems for some reason (perhaps related to shoplifting that appears in a later record). [Tr. at 168-69.] She continued to have relationship problems in 1999 and was "slightly depressed and anxious". [Tr. at 165-66.] None of the 1999 office records state that Dr. Leiby viewed Salazar as disabled or incapable of working.

### *2000 Medical Records and Applications for Benefits*

In 2000, Salazar applied for SSI and DIB. Prior to her March 2000 applications, she saw Dr. Leiby several times. His record indicates continuing problems with Salazar's relationships. In

January, she was slightly depressed but somewhat optimistic about the new year. [Tr. at 164.] On February 1, 2000, Salazar was calm and did not feel anxious. [Tr. at 160.] A clinician or employee at Dr. Leiby's office filled out a form for Salazar indicating her diagnoses again of major depression, generalized anxiety and personality disorder. She was assigned a GAF of 60 as of February 2000. [Tr. at 161.] On March 7, Salazar reported rare suicidal ideation but still no plan. Her mood fluctuated. She was having difficulty maintaining employment and indicated that she was considering applying for social security benefits. [Tr. at 159.] None of Dr. Leiby's records up until this date reveal any opinion that Salazar was incapable of working.

However, that changed on March 21, 2000, when Salazar brought Dr. Leiby her application forms for benefits. She reported that she recalled being depressed as early as 1992 (rather than 1994, as she had previously indicated). She stated that 1992 was the last time she held a full-time job, although this information is inconsistent with work history records she filled out in connection with her benefit application. For the first time, Dr. Leiby noted that a combination of mental factors prevented Salazar from being fully employed, including lack of sleep, loss of energy, easy fatigue and problems focusing. [Tr. at 158.]

On March 21, 2000, Salazar filled out several disability work history reports. She stated on one form that she stopped working on March 20, 1999 because she was fired from a job. [Tr. at 72-73.] Her more detailed work history includes: restaurant bussing job from 1987-1992; restaurant bussing job at Camel Rock Casino from February 1996 to February 1997; custodial position at Camel Rock for about eight months in 1997; custodial position at a country club in 1998; custodial position at a health club from July 1998 to March 20, 1999. [Tr. at 73.] At most of these positions, Salazar worked five days a week and eight hours a day, although some involved shorter hours. She could

-8-

lift 50 pounds frequently.  [Tr. at 73-78.]  On another March 21 form, signed by Dr. Leiby, Salazar reported that she typically arose at 8 a.m. and cleaned houses from 9 to 1 p.m.  She slept about five hours a night and had problems sleeping.  She prepared her own meals, and also ate at her mother's house next door.  She could clean her house and shop for food. and clothing.  She watched television and listed to games shows on the radio.  She drove but had no hobbies.  [Tr. at 81.]

On March 27, 2000, Salazar signed her applications for DIB and SSI.  A work activity report, signed by a disability interviewer, indicates that Salazar was fired by an employer on March 20, 1999 for non-disability reasons.  [Tr. at 91.]  However, Salazar claims she was fired because of missed work due to depression.  [Tr. at 266-67.]

On April 4, 2000, weeks after Salazar initiated the benefit process, Dr. Leiby's office record indicates for the first time that Salazar also was complaining of physical pain – in her right upper arm. This record states that Salazar is not able to work, and continues to be depressed even on the medications.  [Tr. at 157.]  On May 2, the record again notes complaints of pain radiating down her arm and into her hand, but she had no insurance to check out the source of her problem.  Dr. Leiby found that the pain added to her "disability" at that point and advised her to see someone about the pain.  The record further states that Salazar continued to be disabled by her mental health condition as well as her physical condition.  Yet, there are no medical records indicating any treatment or testing for her symptoms of physical pain.  [Tr. at 156.]

On May 23, 2000, Dr. Robert Hillman, a consultant for disability services, filled out a psychological source statement as to Salazar's ability to work.  He found that she was not limited in her ability to understand detailed or short instructions and was only mildly limited in the ability to attend and concentrate in a sustained manner and in social interactions.  She was not limited in her

ability to adapt or in many other areas.  [Tr. at 117.]  Other notes by Dr. Hillman indicate that Salazar told him she was applying for benefits because she tired easily and her right arm hurt.  She had been depressed in the past, felt suicidal and had trouble sleeping.  Since she had been taking Paxil, however, she reported she was not as depressed and not suicidal.  Her 21-year old son apparently was living with her then although she also reported living alone and/or that she had little contact with her son.  [Tr. at 81, 114.]  She was supporting herself at this time by cleaning houses occasionally.  She denied the use of alcohol or drugs and had consistently denied their use.  Dr. Hillman noted that her speech was logical and coherent.  She appeared neither depressed nor anxious.  She could abstract without difficulty and her memory was intact.  She was of average intelligence.  He provided a diagnosis of major depressive disorder, presently under treatment with Paxil.  She seemed to have a good response to the medication, and he urged her to contact the Department of Vocational Rehabilitation ("DVR") for training.  He assigned a GAF of 65.  [Tr. at 114.]

On June 6, 2000, Salazar reported to Dr. Leiby that she was somewhat depressed over the last month because of psycho-social stressors.  On June 11, Helen C. Patterson performed a mental RFC assessment.  Mostly, she found no evidence of limitations or evidence of only insignificant limitations for Salazar.  According to Patterson's findings, Salazar was moderately limited only in her ability to respond appropriately to changes in the work setting.  The psychologist also wrote that Salazar appeared to be mentally capable of performing simple one and two step tasks.  Patterson surmised that Salazar's moderate restriction in adaptability might stem from her chronic depression. Patterson referred Salazar to DVR.  [Tr. at 120-22.]

On June 12, 2000, Patterson filled out a Psychiatric Review Technique form on which she noted Salazar's depression but that her symptoms were well controlled with medication.  There were

no restrictions and only a slight functional limitation noted.  [Tr. at 124.]  On July 5, 2000, it appears that another medical consultant for disability services reviewed the forms prepared by Patterson.  The physician's name is illegible but may be Dr. Dallas.  [Tr. at 134, 136, 201.]  Dr. Dallas disagreed with Patterson's ratings on the mental RFC assessment, although it is unclear why he disagreed with them or how he would have changed them.  His handwritten notes indicate "not severe – no limitations." [Tr. at 134.]  He agrees with nearly everything on the Psychiatric Review Technique form except for "Patterson's medical disposition, but again he states nothing was severe.  [Tr. at 136.]  On July 7, 2000, the SSA concluded that Salazar's major depression did not prevent her from working and performing one and two step tasks.  [Tr. at 41.]

On July 11, Salazar complained to Dr. Leiby of marked depression.  She was crying and had low energy.  She was saddened by the denial of her application for benefits.  [Tr. at  154.]  She appealed the denial.  A July 24 Reconsideration Disability Reports reflects complaints of depression, chronic pain, fatigue, and for the first time that her joints popped.  She stated that she could not work because her joints popped in her legs, knees and shoulders.  She was unable to stand or carry heavy things.  She was depressed and anxious and severely fatigued.  [Tr. at 95-97.]

On August 1, 2000, Salazar was seen at the Pecos Valley Medical Center.  Complaints of musculoskeletal pain in the upper right deltoid were noted.  She had bilateral joint pain.  Her lab results were within normal ranges.  An exam showed full range of motion in her knees.  [Tr. at 140-41.]  On August 8, she reported to Dr. Leiby that she was quite perturbed and somewhat angry.  She was upset with her father and her boyfriend saying he was no fun.  Depakote was prescribed and the Paxil was increased to 30 mg.  [Tr. at 153.]  She continued with problems with her boyfriend and father in September, but was tolerating the medications well.  [Tr. at 152.]

-11-

On September 12, 2000, Jim Kuzava filled out a Salud Behavior Health Clinical Form.  He was helping Salazar develop cognitive and behavioral skills to control her moods.  This form shows that Salazar's first diagnosis of major depression was July 14, 1998.  In addition, while Salazar always had denied use of alcohol previously, she admitted to Kuzava "ETOH 2x3x/week– 6-12 beers." [Tr. at 181.]  At this time, she continued to work part-time.  The records reflects that she was charged with shoplifting in1999.  [Tr. at 179.]  Her GAF was 60.  [Tr. at 180.]

In October 2000, Dr. Leiby wrote that Salazar's life seemed chaotic due to relationship with her boyfriend who might be abusive to her at times.  [Tr. at 220.]

On October 11, 2000, Dr. Elizabeth Chiang filled out a Psychiatric Review Technique form.  She rated Salazar with mild restrictions but had insufficient information as to repeated episodes of deterioration.  Her psychiatric impairment was nonsevere.  [Tr. at 184-96.]

On October 23, the SSA denied her request for reconsideration and found that her complaints were not severe enough to be disabling.  [Tr. at 47.]  On November 11, Salazar was discouraged about the denial letter.  Dr. Leiby wrote that she continued to be disabled by her mental health condition complicated by medical problems.  She was mildly to moderately depressed that day and was assigned a GAF of 40.  Most of these appointments with Dr. Leiby lasted about 15 minutes.  [Tr. at 219.]

On December 5, 2000, Dr. Leiby filled out some social security forms for Salazar.  He reported a GAF of 40 again and stated that she clearly needed benefits in order for her to secure adequate medical treatment for her various conditions.  She continued to receive medications at that time through the Indigent Fund.  [Tr. at 218.]

### *2001-2002 Medical Records*

In January 2001, Salazar still complained of the same depression/anxiety and physical pain. She was anxious and quite moody.  She reported that she attempted to work at Salvation Army, sorting clothing and items but found that overbearing.  [Tr. at 217.]  On a request for hearing form, Salazar indicated that she had worked at Salvation Army since October 2000.  [Tr. at 103.]  She was taking 20 mg. of Paxil at this time and Ibuprofen.  [Tr. at 103.]

Salazar saw Dr. Leiby numerous times during 2001 as well.  He continued to treat her for major depression and to help her fill out social security forms.  Nearly all of his office records in 2001 indicate that she was disabled and needed benefits.  [Tr. at 216, 215, 213, 210, 211.]  She continued to complain of physical pain during this year as well.  On April 4, 2001, Dr. Leiby noted that she was mildly depressed, yet on May 1, he stated that she "continues to be disabled due to her depression complicated by her physical problems which include osteoarthritis and musculoskeletal problems related to old injuries."  Her constant pain was complicating the nature of her depression.  She remained isolated most of the time and had little energy.  Due to her inability to work, Dr. Leiby believed that every effort should be made to assist her in obtaining benefits.  [Tr. at 213.]

On July 3, 2001, Salazar was quite tearful.  She had been apprehended by police for DWI four weeks earlier and taken to jail in handcuffs.  She supposedly told the officers to kill her, as she was being transported.  She was exceedingly depressed that day, and Dr. Leiby noted that the symptoms of her major depression were quite severe.  [Tr. at 212.]  On August 7, Salazar was nervous and upset due to having to go to court for the DWI.  [Tr. at 210-11.]  On December 4, the record indicates that she was having problems with her family and boyfriend.  She was tearful and depressed. [Tr. at 209.]

-13-

In 2002, Dr. Leiby saw Salazar about five times.  She continued having problems with depression, sleeplessness and lack of energy.  In January, she started taking Neurontin.  It appears she was taking 30 mg of Paxil then.  [Tr. at 208.]

On February 21, 2002 (or possibly May 29, 2002), ALJ Larry Johnson held a hearing on Salazar's benefit application.  Salazar was unrepresented.  After hearing a detailed explanation from Judge Johnson about how she might obtain representation, she elected to continue the hearing until she found an attorney.  [Tr. at 240, 251.]

Dr. Leiby's March and April office records are very similar to the other records.  He believed that she was unable to work, and that she remained depressed with complicating physical pain.  Indeed, he concluded Salazar was 100% disabled due to her physical handicaps and mental condition.  [Tr. at 206, 222.]

On June 11, 2002, it appears that Dr. Leiby faxed a copy of his Mental RFC Assessment to Salazar's attorney.  In this report, that is undated itself, Dr. Leiby found marked limitations in many areas for Salazar.  He also stated that she did not have an alcohol abuse problem.  [Tr. at 225.]

On June 27, 2002, Judge Gerald Cole held the administrative hearing, and Salazar was represented this time.  [Tr. at 262 - 288.]  Salazar testified that she lived alone in a mobile home and paid her bills by finding houses to clean.  She owned her own home and had two regular house cleaning jobs.  She had cleaned houses then for about a year.  She did her own cooking or ate at her mother's house.  She could do her laundry and some shopping.  She sometimes helped her mother water the lawn and assisted her father who was in a wheelchair.  She watched TV.  She drove herself from the Pecos area to Santa Fe to clean the houses.  She claimed that she was fired from Camel Rock about four years ago because she missed a lot of work.  She applied for unemployment

compensation but did not receive it.  She did not know why she selected the date of December 1, 1992 for the onset of her depression, as set out in her applications for benefits.

Judge Cole asked her about her physical problems or pain, and Salazar responded that her legs and knees hurt.  About four years ago, her knees started to pop and they just hurt.  With respect to any mental problems, Salazar stated that she had been depressed for five years.  Her depression and anxiety made her tire quickly, and depleted her energy.  Salazar had problems sleeping.  She reported having a few friends and that she visited her niece in Santa Fe.  One of her house cleaning employers was attempting to locate other houses for Salazar to clean.

A VE testified at the hearing.  He responded to hypotheticals presented by Judge Cole.  [Tr. at 283.]  The ALJ stated hypothetically that Salazar had no exertional limitations, could do simple, repetitive work without extensive contact with the public or co-workers/supervisors.  The VE testified that Salazar would be able to do 20 percent of medium jobs, 15 percent of light work and 10 percent of sedentary work under those conditions.  However, if the VE assumed she had all the restrictions that she claimed to have, he was not certain that there would be work in the economy that she could perform.  Upon questioning by Salazar's attorney, the VE agreed that she would not be able to work if she was deficient in the areas of concentration, persistence or pace resulting in failure to complete tasks in a timely manner and if she was absent frequently from work.  [Tr. at 286-87.]

On October 2, 2002, Judge Cole issued a decision denying the request for benefits.  [Tr. at 12-21.]

## Discussion

In this appeal, Salazar asserts the ALJ made a number of errors and that some of his findings were not supported by substantial evidence.  She specifically argues that Judge Cole erred in using

the grids even as a framework when there were no exertional limitations, in failing to obtain specific occupations Salazar allegedly could do, and in discounting the treating psychiatrist's opinion. Salazar further argues that the hypothetical given to the VE was not supported by the evidence and that the credibility findings were not supported by substantial evidence in the record. [Doc. No. 7.] The Commissioner claims that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. No. 10.] In Salazar's reply, she asserts that while the court may reverse on other issues she raised in her opening brief, the primary issue is whether the ALJ improperly rejected the opinions of Salazar's treating psychiatrist. [Doc. No. 12.]

I.    **WEIGHT OF TREATING PSYCHIATRIST'S OPINIONS**

"An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (*citing* 20 C.F.R. § 416.927(d)(2)). Treating physicians' opinions typically are entitled to extra weight because the treating doctor is usually more familiar with a claimant's medical condition than other physicians. Kemp v. Bowen, 816 F.2d 1469, 1476 (10th Cir. 1987). A treating physician may offer an opinion about the nature and severity of a claimant's impairments in social security cases. Green v. Barnhart, 262 F. Supp. 2d 1271, 1277 (N.D. Okla. 2003). Indeed, a treating physician may even opine that a claimant is totally disabled. Id. However, the opinion that a claimant is disabled from working "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." Id. (*citing* Drapeau, 255 F. 3d at 1213).

In determining how much weight a treating physician's opinion deserves, the court considers if the opinion is "well supported by clinical and laboratory diagnostic techniques and if it is not

inconsistent with other substantial evidence in the record." <u>Castellano v. Sec'y of Health & Human Services</u>, 26 F.3d 1027, 1029 (10th Cir. 1994).  A treating physician's opinion may be rejected "if it is brief, conclusory, and unsupported by medical evidence."  <u>Frey v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987).

If an ALJ rejects or discounts a treating physician's opinion, the judge must set forth "specific, legitimate reasons" for doing so.  <u>Byron v. Heckler</u>, 742 F.2d 1232, 1235 (10th Cir. 1984).  In such instances, the ALJ must not make speculative inferences from medical reports.  <u>McGoffin v. Barnhart</u>, 288 F.3d 1248, 1252 (10th Cir. 2002).  An ALJ may only reject a treating physician's opinion outright based on contradictory medical evidence, and not on the judge's own credibility judgments, speculation, or lay opinion.  <u>Id.</u>

In determining the appropriate weight owed to a treating physician's opinion, the Tenth Circuit has outlined the following factors to consider: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship, including treatment provided and examinations that were performed; (3) degree to which the opinion is supported by relevant evidence; (4) consistency between the opinion and record as a whole; (5) area of specialty of the treating physician in relation to the opinion given; and (6) other factors brought to the ALJ's attention that may or may not support the opinion.  <u>Goatcher v. United States Dep't of Health & Human Services</u>, 52 F.3d 288, 290 (10th Cir. 1995); 20 C.F.R. § 404.1527(d)(2)-(6).

Here, Salazar's treating psychiatrist, Dr. Leiby, opined repeatedly that Salazar was disabled, was unable to work, and should be awarded benefits.  He concluded that she was disabled both by her mental condition and the physical pain that she reported to him during office visits.  The ALJ

disregarded some of Dr. Leiby's opinions and set forth ample legitimate reasons for doing so in his decision denying benefits.

Indeed, Judge Cole acknowledged in his decision the general rule that he must accord substantial weight to a treating physician's opinions. However, he disregarded or discounted Dr. Leiby's opinions for the following reasons and discrepancies or inconsistencies: (1) Dr. Leiby finds Salazar 100% disabled in September 2001, due to her depression that he states was only partially responsive to her medications, and yet does not change her medication; (2) Dr. Leiby finds Salazar is 100% disabled due to her mental condition *and physical condition* or chronic pain that aggravates the treatment of her depression, and yet there is absolutely no clinical testing or reports to substantiate Salazar's physical complaints, nor is Dr. Leiby a specialist in that particular area; (3) all of Salazar's complaints of physical pain or impairment appear to be subjectively reported to Dr. Leiby, and yet he concludes summarily that "clearly" such pain aggravates her mental condition; (4) Dr. Leiby opines that Salazar is unable to work and that she has physical limitations, but he never provides any specific limitations that she might have, nor does he appear to examine her, even if he did have that expertise; (5) prior to deciding to apply for benefits, none of Dr. Leiby's office records indicate that he believed she was disabled or could not work; however, upon applying and subsequent to her application, notes of disability appear regularly; (6) her GAF scores vary rather significantly for unknown reasons, e.g., in 1998, Dr. Leiby assigned a GAF of 40 and yet she appears to be working at least part-time during that time period if not longer hours [tr. at 73, 172-73, 176] in contrast with her GAF of 60 in 2000 [tr. at 161, 180][11] and her GAF of 40 again in 2001 and 2002.

---

[11]The GAF ratings of 40 may have been provided by clinicians in Dr. Leiby's medical facility rather than by Leiby himself.

Although the ALJ did not specifically mention the lack of any objective mental impairment examination or testing of Salazar by Leiby, the Court simply observes that there was no such testing or referral for such testing by Leiby.

In addition to the above discussion of discrepancies or inconsistencies in Dr. Leiby's treatment notes, the ALJ properly found some of Dr. Leiby's opinions were outweighed by other substantial evidence in the record.  For example, Salazar's own testimony and varying recitation of her work history indicates that she is able to work.  Her claim that she was terminated from jobs previously due to her inability to attend work because of depression is inconsistent with her supposed application for unemployment benefits.  Her doctor repeatedly writes that she is 100% disabled and yet she drives to Santa Fe to clean houses and is looking for more work.  She attempts to paint a picture of herself in which she is isolated and unable to do anything at all, and yet there are many references in her medical records about a boyfriend.  She testifies that she has no energy and sleeps all of the time, but she also testifies that she cleans houses, visits her niece in Santa Fe, goes out with a friend on occasion who picks her up, eats meals with her parents, and can shop, clean and take care of personal needs.  She claims to be a non-drinker, or at least a number of records indicate that she denied drinking,  However, one record shows that she did drink and was drinking six to twelve beers two or three times a week.  [Tr. at 181.]  Indeed, she was arrested for DWI.  [Tr. at 210-12.]

Finally, in addition to Salazar's testimony, the ALJ relied on several medical or psychological consultants' assessments of Salazar.  In May 2000, Dr. Hillman concluded that Salazar was mildly limited in several work-related activities and not limited in a number of other categories.  [Tr. at 117.] Dr. Hillman observed Salazar to be neither depressed appearing nor anxious.  He assigned a GAF of 65 on that date.  [Tr. at 115.]  In June 2000, state psychologist, Ms. Patterson, found few signs of

any significant types of limitations and noted that Salazar appeared mentally capable of performing at least simple 1-2 step tasks. As of June 2000, Salazar's depression was under control with her medications. She was given only a slight degree of limitation in most functional areas by Patterson. [Tr. at 132.] While a medical consultant appeared to disagree with some of Patterson's assessments, that consultant still determined that Salazar's limitations were not severe, or that she had no limitations. [Tr. at 135.] In October 2000, Dr. Chiang, another medical consultant, also determined that Salazar's limitations were mild for the most part. [Tr. at 184.]

The ALJ discussed in his decision all of the above described evidence. Judge Cole also acknowledged that there is an undated, unsigned Mental RFC Assessment, with three different fax dates (2/28/02, 5/28/02 and perhaps 6/12/02), that was apparently faxed to Salazar's attorney by Dr. Leiby on June 11, 2002. [Tr. at 225.] That Assessment differs from the above consultants' assessments in that Dr. Leiby found Salazar was markedly limited in a number of categories, moderately limited in several and not significantly limited in only a few. Dr. Leiby concluded that Salazar had moderate limitations in social functions and concentration, persistence and pace and slight limitations in daily living activities. [Tr. at 227.] The ALJ found this undated and unsigned assessment by Dr. Leiby, that apparently was faxed shortly after the administrative hearing was held, to be of little assistance, and even at times to be internally inconsistent.

The Court concludes that Judge Cole set forth ample and legitimate reasons for disregarding Dr. Leiby's faxed assessment of Salazar and for discounting Dr. Leiby's opinions that Salazar was unable to work and/or 100% disabled. The record contains substantial support for the ALJ's decision.

-20-

## II.   ALJ'S USE OF GRIDS AS FRAMEWORK

The grids consider only exertional or strength impairments.  Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991).  Exclusive resort to the grids is inappropriate when evaluating nonexertional limitations, such as a severe mental impairment.  Grimiar v. Sullivan, 966 F.2d 1326, 1333 (10th Cir. 1992).  An exception to this general rule, however, allows an ALJ to use the grids as a "framework" for evaluating disability when non-exertional impairments are present, and when combined with evidence such as testimony from a vocational expert.  *See* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993); Hargis, 945 F.2d at 1490.  For example, where there are nonexertional limitations, a vocational expert must be consulted to determine whether a significant number of jobs is available in the national/regional economies that the claimant can perform despite the impairments.  Cruse v. U.S. Dept. of HHS, 49 F.3d 614, 619 (10th Cir. 1995).

Salazar presents a slightly different twist to the usual argument that the ALJ improperly relied on the grids where there was evidence of a non-exertional impairment.  Salazar argues that the ALJ improperly used the grids as a framework for his decision because the ALJ concluded she had no physical or exertional limitations.  Thus, since the grids only address exertional limitations, it was error to apply them even as a framework in reaching the decision.  Salazar primarily characterizes this argument as one sounding in logic, and the Court notes that her argument has some superficial appeal.  However, Salazar provides no legal authority for the proposition that the grids cannot be used as a framework for making a decision in cases where there are non-exertional but no exertional limitations, when the ALJ also relies on a VE's testimony.

Here, Judge Cole found Salazar had no exertional limitations, but did have non-exertional limitations.  He then used the grids as a framework for his decision, along with VE testimony.  Judge

Cole stated that "[b]ased upon . . . expert testimony [of the VE] and applying the above-cited Medical-Vocational Rules [grids] as a framework for decision making, I find that [Salazar] has retained the capacity to perform a significant number of other jobs throughout the period under review." [Tr. at 19.] Even if the Court were to find that the ALJ committed a technical error in using the grids as a framework under circumstances where there were no exertional limitations, any such error is harmless because the ALJ properly evaluated Salazar's non-exertional impairment(s) through the use of a VE's testimony.

## III.   SPECIFIC IDENTIFICATION OF OCCUPATIONS THAT SALAZAR COULD PERFORM

Salazar argues that the Commissioner failed to sustain her burden because the ALJ did not cite specific examples of occupations or jobs that Salazar could do.  Salazar relies, in part, on the Tenth Circuit decision in Haddock v. Apfel, 196 F.3d 1084 (10th Cir. 2000), which resulted in a remand so that the ALJ could investigate whether there was a significant number of specific jobs that the claimant could have done with his exertional limitations.  Id. at 1092.  The facts in Haddock are distinguishable from those here in a number of ways – first, Haddock had exertional limitations including hip problems, and Salazar does not.  Second, there were occupations specifically identified that Haddock could perform.  Here, while not identifying specific jobs which Salazar could perform, Judge Cole noted that Salazar's nonexertional limitations did not substantially reduce the number of sedentary, light, and medium jobs that she could perform.  The ALJ further noted that Salazar actually was working as a housekeeper.  She testified that she could drive to Santa Fe to do that work, performed that work for a number of hours several days out of a week, and appeared receptive to

finding other similar types of housecleaning work.  Clearly, Salazar was capable of performing that work.  Thus, the Court does not find that <u>Haddock</u> is particularly instructive with respect to this case.

In addition, this is not a case that involves questions of whether Salazar was given an adequate opportunity to show that she was incapable of performing certain jobs.  By her own testimony (and along with that of the VE), she obviously was capable of, and indeed, was performing certain work that existed in the economy.

Thus, the Court rejects Salazar's argument and finds that substantial evidence supports the Commissioner's decision.

## IV.   HYPOTHETICAL TO VE AND CREDIBILITY DETERMINATIONS

The Court finds neither of Salazar's remaining two arguments convincing.  Indeed, Salazar provides only minimal additional argument in her reply brief to support her initial positions that the ALJ's hypothetical to the VE did not reflect Salazar's impairments or that the ALJ's credibility findings were unsupported by the record.  The ALJ adequately explained why he discounted some of the treating psychiatrist's "specific limitations" and/or Dr. Leiby's unsupported conclusions as to the "seriousness" of certain impairments Salazar claimed to have.  Thus, substantial evidence supports the hypothetical that was presented to the VE, because the limitations/restrictions that Salazar sought to be included simply were unsupported by objective medical evidence or were properly discounted by the ALJ as explained at length above.

The Court also finds that substantial evidence supports the ALJ's credibility determinations for the ample reasons noted in the ALJ's decision and as noted above.  Moreover, this Court recognizes that in terms of credibility decisions, it should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." <u>Casias v. Sec'y of HHS</u>, 933

F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." <u>Hamilton v. Sec'y of HHS</u>, 961 F.2d 1495, 1499 (10th Cir.1992)

Here, the Court concludes that Judge Cole's credibility findings were "closely and affirmatively linked to substantial evidence" in the record and were not merely conclusions in the "guise of findings." *See* <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995). Thus, substantial evidence supports the ALJ's credibility determinations.

### Conclusion

For all of the above-stated reasons, the Court concludes that Salazar's motion to reverse and remand should be denied and that this matter should be dismissed, with prejudice.

IT IS THEREFORE ORDERED that Debbie Salazar's Motion and Memorandum in Support of Reversal [Doc. No. 7] is DENIED and that this matter is dismissed, with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge